Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRED WALKER,<br><br>    Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION, TROY A. CLARKE, JOSÉ MARÍA ALAPONT, STEPHEN R. D'ARCY, JEFFREY A. DOKHO, VINCENT J. INTRIERI, MARK H. RACHESKY, CHRISTIAN SCHULZ, KEVIN M. SHEEHAN, DENNIS A. SUSKIND, and JANET T. YEUNG,<br><br>    Defendants. | Case No:<br><br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Fred Walker ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1.      This is an action against Navistar International Corporation ("Navistar" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

1

Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Navistar by TRATON SE ("Traton") and Dusk Inc., a wholly owned indirect subsidiary of Traton.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, the Company is registered to do business in New York.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff is, and has been at all relevant times hereto, an owner of Navistar's common stock.

7.     Defendant Navistar, through its subsidiaries, manufactures and sells commercial trucks, diesel engines, school and commercial buses, and service parts for trucks and diesel

engines worldwide. The Company is incorporated in Delaware. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "NAV."

8. Defendant Troy A. Clarke ("Clarke") is Chairman of the Board of the Company.

9. Defendant José María Alapont ("Alapont") is a director of the Company.

10. Defendant Stephen R. D'Arcy ("D'Arcy") is a director of the Company.

11. Defendant Jeffrey A. Dokho ("Dokho") is a director of the Company.

12. Defendant Vincent J. Intrieri ("Intrieri") is a director of the Company.

13. Defendant Mark H. Rachesky ("Rachesky") is a director of the Company.

14. Defendant Christian Schulz ("Schulz") is a director of the Company.

15. Defendant Kevin M. Sheehan ("Sheehan") is a director of the Company.

16. Defendant Dennis A. Suskind ("Suskind") is a director of the Company.

17. Defendant Janet T. Yeung ("Yeung") is a director of the Company.

18. Defendants Clarke, Alapont, D'Arcy, Dokho, Intrieri, Rachesky, Schulz, Sheehan, Suskind, and Yeung are collectively referred to herein as the "Individual Defendants."

19. Defendants Navistar and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

20. On November 7, 2020, Navistar and Traton announced that they had entered into a definitive merger agreement pursuant to which Traton would become the owner of all of the outstanding common shares of Navistar not already owned by Traton at a price of $44.50 per share in cash. The announcement of the merger states, in pertinent part:

**TRATON and Navistar Reach Definitive Agreement for Acquisition of Navistar at USD 44.50 Per Share in Cash**

MUNICH & LISLE, Ill., November 7, 2020 – TRATON SE ("TRATON"), one of the world's largest commercial vehicle manufacturers, and Navistar International Corporation ("Navistar") (NYSE: NAV), a leading U.S. truck maker, today announced that they have entered into a definitive merger agreement pursuant to which TRATON will become the owner of all of the outstanding common shares of Navistar not already owned by TRATON at a price of USD 44.50 per share in cash. TRATON currently owns 16.7% of the outstanding shares of common stock of Navistar.

Beginning in March 2017, TRATON and Navistar have benefitted from a strategic alliance that has delivered significant value to both companies through increased purchasing scale and the integration of new technologies. This transaction builds on that success by combining TRATON's strong position in Europe and substantial presence in South America with Navistar's complementary footprint in North America to create a global company well-positioned to benefit from enhanced brand performance, increased innovation and industry-leading capabilities.

"Today's announcement accelerates our Global Champion Strategy by expanding our reach across key truck markets worldwide, including scale and capabilities to deliver cutting-edge products, technologies and services to our customers," said TRATON CEO Matthias Gründler. "Together, we will have an enhanced ability to meet the demands of new regulations and rapidly developing technologies in connectivity, propulsion and autonomous driving for customers around the world. Navistar has been a valuable partner, and we are confident this combination will deliver compelling strategic and financial benefits, create enhanced opportunities for both Navistar and TRATON, and best position us to drive sustained value in the evolving global commercial vehicle industry."

"This transaction builds upon our highly collaborative and successful strategic alliance and further enhances the growth trajectory of the combined company, while delivering immediate and substantial value to our shareholders," said Navistar President and CEO Persio Lisboa. "We look forward to continuing to work with the TRATON team to create opportunities for our employees and provide an outstanding experience for our customers and dealers through best-in-class products, services and technologies."

Gunnar Kilian, member of the Board of Management of Volkswagen AG and responsible for the Truck & Bus division, said: "Volkswagen is TRATON's biggest shareholder. The agreement is thus an important milestone for Volkswagen because it underpins our strong strategic commitment to continue driving growth also during the ongoing challenging economic climate. The acquisition of Navistar will significantly leverage TRATON's positioning in North America, one of the biggest

4

and most profitable markets for heavy trucks. Together, the companies can enhance scale and reach in key markets as well as create further synergies."

**Financing**

The sources of funding for the cash acquisition of the outstanding Navistar shares not already owned by TRATON includes fully committed financing by Volkswagen Group for the equity purchase price of about USD 3.7 billion. TRATON remains committed to maintaining an investment grade rating.

**Timing and Approvals**

The transaction is targeted to close in mid 2021, and is subject to Navistar shareholder approval, customary closing conditions as well as regulatory approvals. Major shareholders Icahn Capital LP and MHR Fund Management LLC have agreed to vote their shares in favor of the transaction.

\* \* \*

**About the Volkswagen Group:**

Based in Wolfsburg, Germany, the Volkswagen Group is one of the world's leading automotive manufacturers, and the largest car maker in Europe. The Group comprises twelve brands from seven European countries: Volkswagen Passenger Cars, Audi, SEAT, ŠKODA, Bentley, Bugatti, Lamborghini, Porsche, Ducati, Volkswagen Commercial Vehicles, Scania and MAN. The passenger car portfolio ranges from small cars all the way to luxury-class vehicles. Ducati offers motorcycles. In the light and heavy commercial vehicles sector, the products range from pick-ups to buses and heavy trucks. Every weekday, 671,205 employees around the globe produce on average 44,567 vehicles, are involved in vehicle-related services or work in other areas of business. The Volkswagen Group sells its vehicles in 153 countries. In 2019, the total number of vehicles delivered to customers by the Group globally was 10.97 million (2018: 10.83 million). The passenger car global market share was 12.9 percent. Group sales revenue in 2019 totalled EUR 252.6 billion (2018: EUR 236 billion). Earnings after tax in the fiscal year now ended amounted to EUR 14.0 billion (2018: EUR 12.2 billion).

**About TRATON SE:**

TRATON SE is a subsidiary of Volkswagen AG and a leading commercial vehicle manufacturer worldwide with its brands MAN, Scania, Volkswagen Caminhões e Ônibus, and RIO. In 2019, TRATON GROUP's brands sold around 242,000 vehicles in total. Its offering comprises light-duty commercial vehicles, trucks, and buses at 29 production and assembly sites in 17 countries. The Company had a workforce of around 82,700 employees worldwide across its commercial vehicle brands as of December 31, 2019. The Group seeks to transform the transportation system through its products, its services, and as a partner for its customers.

**About Navistar:**

Navistar International Corporation (NYSE: NAV) is a holding company whose subsidiaries and affiliates produce International® brand commercial trucks,

5

proprietary diesel engines, and IC Bus® brand school and commercial buses. An affiliate also provides truck and diesel engine service parts. Another affiliate offers financing services. Additional information is available at www.Navistar.com.

21. On January 21, 2021, Defendants caused to be filed with the SEC a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

### B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

22. The Proxy Statement, which recommends that Navistar shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and PJT Partners LP ("PJT," and together with J.P. Morgan, the "Financial Advisors"), in connection with their fairness opinions; and (iii) potential conflicts of interest involving J.P. Morgan.

23. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Reasons for the Merger; Recommendation of the Company's Board of Directors; (ii) Opinions of the Financial Advisors to the Company; and (iii) Certain Company Forecasts.

24. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Navistar shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

#### 1. Material Omissions Concerning the Company's Financial Projections

25. The Proxy Statement omits material information concerning the Company's

6

financial projections.

26. With respect to the Company's 2020 Strategic Plan, the July 2020 management projections, the August operational update, and the Base Case and Upside Case management projections, the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Adjusted EBITDA, (iii) Manufacturing Adjusted EBITDA, (iv) Manufacturing EBITDAPO, and (v) Unlevered Free Cash Flow; and (2) a reconciliation of all non-GAAP to GAAP financial metrics.

27. Moreover, the Proxy Statement provides that a positive factor the Board believed supported its decision to recommend that Navistar shareholders vote in favor of the Proposed Transaction were "[t]he anticipated synergies from the combination of the two companies," stating in pertinent part:

> The anticipated synergies from the combination of the two companies, as identified through the Company's strategic alliance with TRATON on procurement and technology development, including additional cost savings, a full integration of research and development capabilities and cost of capital opportunities, and the fact that the Company's stockholders would have the certainty of participating in a portion of the benefits from these anticipated synergies through the premium on the Company's common stock per share price to be paid in connection with the consummation of the Merger[.]

28. The Proxy Statement, however, fails to disclose the anticipated synergies expected to result from the Proposed Transaction despite the fact that they formed a key basis of the Board's recommendation.

29. When a company discloses non-GAAP financial metrics in a Proxy Statement, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with

GAAP. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[1]

30. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisors in support of their fairness opinions. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to vote for or against the Proposed Transaction.

31. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning the Financial Advisors' Analyses**

32. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by the Financial Advisors.

33. With respect to the Financial Advisors' "*Public Trading Multiples*" analysis and "*Selected Transaction Analysis*," the Proxy Statement fails to disclose the individual multiples and

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Jan. 25, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

financial metrics of the companies and transactions the Financial Advisors observed in its analyses.

34. The Proxy Statement fails to disclose the following concerning the Financial Advisors' "*Discounted Cash Flow Analysis*": (1) all line items underlying the unlevered free cash flows utilized by the Financial Advisors; (2) the range of terminal values of the Company; and (3) the individual inputs and assumptions underlying the (i) perpetuity growth rates ranging from 1.0% to 2.0%, and (ii) range of discount rates from 9.5% to 10.5%.

35. With respect to the Financial Advisors' "*Analyst Price Targets*" analysis, the Proxy Statement fails to disclose: (1) the individual price targets observed by the Financial Advisors in its analysis; and (2) the sources thereof.

36. The valuation methods, underlying assumptions, and key inputs used by the Financial Advisors in rendering their purported fairness opinions must be fairly disclosed to Navistar shareholders. The description of the Financial Advisors' fairness opinions and analyses, however, fail to include key inputs and assumptions underlying those analyses. Without the information described above, Navistar shareholders are unable to fully understand the Financial Advisors' fairness opinions and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

    **3. Material Omissions Concerning Potential Conflicts of Interest Involving J.P. Morgan**

37. The Proxy Statement omits material information concerning potential conflicts of interest involving J.P. Morgan.

38. The Proxy Statement provides that J.P. Morgan and its affiliates received compensation for providing past services to Navistar, Traton, and Volkswagen AG, stating in

9

pertinent part:

> During the two years preceding the date of its opinion, J.P. Morgan and its affiliates had commercial or investment banking relationships with the Company and Parent for which J.P. Morgan and such affiliates received customary compensation. Such services during such period included acting as joint lead arranger and joint lead bookrunner on a credit facility of a subsidiary of the Company in May 2019 and joint lead bookrunner on an offering of debt securities of the Company in April 2020, and acting as joint lead bookrunner on the initial public offering of equity securities of the Parent in June 2019. In addition, during the two years preceding the date of its opinion, J.P. Morgan and its affiliates had commercial or investment banking relationships with Volkswagen AG for which J.P. Morgan and such affiliates received customary compensation. Such services during such period included acting as joint lead arranger and joint bookrunner on a credit facility of Volkswagen AG in December 2019, as joint lead bookrunner on offerings of debt securities of subsidiaries of Volkswagen in November 2019, June 2019 and March 2020 and acting as financial advisor to Volkswagen AG on a strategic investment in June 2020. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of the Company, for which it receives customary compensation or other financial benefits.

39. The Proxy Statement, however, fails to disclose the amount of compensation that J.P. Morgan and its affiliates received or expect to receive for providing the aforementioned services to Navistar, Traton, and Volkswagen AG.

40. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

41. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

42. Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

43. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

44. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

45. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

46. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

47. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

49. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

52. In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

  E. Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 25, 2021        Respectfully submitted,

                **HALPER SADEH LLP**

                By: /s/ Daniel Sadeh
                Daniel Sadeh, Esq.
                Zachary Halper, Esq. (to be admitted *pro hac vice*)
                667 Madison Avenue, 5th Floor
                New York, NY 10065
                Telephone: (212) 763-0060
                Facsimile: (646) 776-2600
                Email: sadeh@halpersadeh.com
                    zhalper@halpersadeh.com

                *Counsel for Plaintiff*